Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiffs*
[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICKOLAS VAN WINGERDEN AND BRIAN KOVAR, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>CADIZ INC., SCOTT S. SLATER, TIMOTHY J. SHAHEEN, and KEITH BRACKPOOL,<br><br>Defendants. | Case No: 2:15-cv-03080-JAK-JEM<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

NATURE OF THE ACTION .......... 1

JURISDICTION AND VENUE .......... 7

PARTIES .......... 7

SUBSTANTIVE ALLEGATIONS .......... 11

Background .......... 11

Defendants' Materially False and Misleading Statements Concerning the Project 16

Disclosures at the End of the Class Period .......... 30

PLAINTIFFS' CLASS ACTION ALLEGATIONS .......... 49

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .......... 51

APPLICABILITY OF PRESUMPTION OF RELIANCE: AFFILIATED UTE .......... 52

FIRST CLAIM Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants .......... 52

SECOND CLAIM Violation of Section 20(a) of The Exchange Act Against the Individual Defendants .......... 55

JURY TRIAL DEMANDED .......... 57

Lead Plaintiffs Nickolas Van Wingerden and Brian Kovar ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, allege in this Complaint the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, facts obtained through an investigation conducted by and under the supervision of their counsel, which included, *inter alia*: (a) review and analysis of regulatory filings made by Cadiz Inc. ("Cadiz" or the "Company") with the United States ("U.S.") Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public statements and documents, press releases, and media reports issued by and disseminated by Cadiz and/or its management; (c) review and analysis of news articles and other publicly available information concerning the Company; and (d) review of information provided by U.S. Department of the Interior's (the "Department") Bureau of Land Management ("BLM").

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants and/or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the common stock of Cadiz during the period of March 11, 2014 through October 9, 2015, inclusive and did not sell such common stock prior to April 21, 2015 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Cadiz is a land and water resource development company with 45,000 acres of land in three areas of eastern San Bernardino County, California. For more than 20 years, the Company has maintained an agricultural development at its 34,000-

acre property in the Cadiz and Fenner valleys of eastern San Bernardino County (the "Cadiz/Fenner Property").

3. In addition to its agricultural operations, Cadiz has been primarily focused on the development of the Cadiz Valley Water Conservation, Recovery and Storage Project (the "Project"). According to the Company, the Project is designed to capture and conserve billions of gallons of groundwater flowing beneath the Mojave Desert. The purported intent of the project is to reduce the loss of groundwater from the evaporation from the dry lakes, or aquifer system beneath the Cadiz/Fenner property, and to deliver the water to water providers throughout Southern California. According to the Company, the total quantity of groundwater to be recovered and supplied will not exceed a long-term annual average of 50,000 acre-feet per year for 50 years.

4. The Project entails two phases. Phase I involves the construction of high yield wells to capture and conserve water and a 43 mile water conveyance pipeline from the well field to the Colorado River Aqueduct ("CRA") to transport the recovered groundwater to participating water providers, including the Santa Margarita Water District (the "SMWD"), and an energy source to provide power to the well-field, pipeline and pumping plant. Phase II involves the construction of new facilities for the storage of up to one million acre-feet of groundwater space in the aquifer system underlying the Cadiz/Fenner Property for water imported to the Project area.

5. In September 2008, the Company entered into a lease agreement with the Arizona & California Railroad Company ("ARZC"), which operates an active shortline railroad extending from Cadiz, California to Matthie, Arizona, to utilize a portion of ARZC's existing right-of-way[1] between the Cadiz property and the CRA to

[1] A right-of-way is an authorization to use a specific piece of public land for a certain project, including rail transport, roads, and pipelines.

construct the pipeline.

6. Construction of this proposed pipeline would occur on BLM managed land within ARZC's right-of-way ("ARZC ROW") under the General Railroad Right-of-Way Act of March 3, 1875.

7. Pursuant to Opinion M-36964[2], prior BLM practice allowed a railroad right-of-way grantee to enter into agreements for a third-party to use portions of its right-of-way across BLM-managed lands without authorization from the BLM.

8. On November 4, 2011, the Solicitor Office of the U.S. Department of the Interior (the "Solicitor") issued Opinion M-37025, which withdrew those portions of Opinion M-36964 relating to the 1875 Act. Opinion M-37025 concluded that a railroad can only authorize third parties to use 1875 right-of-ways for those activities that "derive from or further a railroad purpose."

9. Pursuant to Opinion M-37025, BLM must determine whether the proposed water conveyance pipeline falls within the scope of the ARZC ROW, *i.e.*, derive from or further a railroad purpose, and how to proceed with evaluating the proposed pipeline if it does not fall within the scope of the ARZC ROW.

10. If the BLM determines that the proposed pipeline falls within the scope of the ARZC's ROW, then no further right-of-way authorization or associated environmental impact analysis would be required for the pipeline.

11. If the BLM determines that the proposed pipeline does not fall within the scope of the ARZC ROW, then the proposed pipeline would require BLM approval through a new right-of-way authorization under the Federal Land Policy and Management Act of 1976 ("FLPMA") as it occurs across BLM-managed lands.

---

[2] An "M Opinion," which is short for "Memorandum Opinion," is a formal written opinion by the Solicitor that presents the official legal interpretation of the Department on matters within the Department's jurisdiction. M Opinions are binding on all Department offices and officials and may be withdrawn, overruled, or modified only by the Solicitor, the Deputy Secretary, or the Secretary.

12. A new right-of-way authorization by the BLM would also be evaluated under National Environmental Policy Act ("NEPA"), which requires federal agencies to analyze their actions in a decision-making process that is subject to public review and to closely examine and disclose the potential environmental impacts of their actions and evaluate alternative actions. Compliance with NEPA is required of all federal agency actions, which includes, but is not limited to, federal construction projects, plans to manage and develop federally owned lands, and federal approvals of non-federal activities such as grants, licenses, and permits.

13. The Consolidated Appropriations Act, 2012 (the "2012 Appropriations Act"), Continuing Appropriations Act, Department of Defense, Military Construction and Veterans Affairs, and Full-Year Continuing Appropriations Act, 2013 (the "2013 Appropriations Act"), the Consolidated Appropriations Act, 2014 (the "2014 Appropriations Act"), and Consolidated and Further Continuing Appropriations Act, 2015 (the "2015 Appropriations Act") each specifically directs the Secretary of the Interior to determine if Cadiz's pipeline falls within the scope of the ARZC ROW. However, they also specified that no appropriated funding should be spent for approval of a right-of-way related to the Project.

14. Therefore, a BLM determination that the proposed pipeline does not fall within the scope of the ARZC ROW effectively renders the Project infeasible because approval of a new right-of-way would require a costly federal review of the Project and the BLM is prohibited from dedicating any funds towards approval of a right-of-way related to the Project.

15. Cadiz had long funded its operations through the offering of debt and securities as it has not received significant revenues from its development activities associated with the Project. Indeed, Cadiz believes the complete implementation of this Project would serve as the primary source of its future cash flow.

16. In 2013, the Company refinanced its term debt, which included: (1) $30 million senior term loan; and (2) $53.5 million in convertible notes. The Company also entered into a credit agreement with its majority senior lender to increase its existing $30 million senior secured mortgage loan by $10 million to fund additional working capital.

17. Throughout 2013, the Company also paid for a number of services using the Company's common stock, including certain legal and advisory services.

18. In July 2013, Cadiz filed a new shelf registration statement on Form S-3 registering the issuance of up to $40 million in shares of the Company's common stock, preferred stock, warrants, subscription rights, units and certain debt instruments in one or more public offerings ("Shelf Registration").

19. In November 2014, Cadiz raised approximately $14.6 million with the sale of 1,435,713 shares at $10.1751 per share by way of takedown from the Shelf Registration.

20. In short, during the time leading up to and throughout the Class Period, Cadiz was desperate for operating cash and resorted to every form of available financing it could obtain to fund its operations.

21. Against this backdrop, Defendants failed to disclose during the Class Period that BLM had repeatedly informed Defendants and their Project partners that the Project's proposed pipeline was not within the scope of the ARZC ROW. Nevertheless, Defendants continued to falsely assert to investors that the proposed pipeline fell within the scope of the ARZC ROW and that federal right-of-way approval would not be required to implement the Project.

22. On April 21, 2015, a research report about the Company was published on the investor news website *Seeking Alpha*, which revealed, among other things, that the Company and its management had received clear and unequivocal guidance from the BLM indicating the Project had effectively failed as far back as 2012 (the

"*Seeking Alpha* Report"[3]) because, among other reasons, the BLM did not find that the Project's proposed pipeline was within the scope of the ARZC ROW.

23. On this news, shares of Cadiz fell $1.05 per share, or nearly 11% over the next two days on unusually heavy volume, to close at $8.65 per share on April 22, 2015.

24. On October 5, 2015, Cadiz revealed that it had indirectly received a letter from the BLM[4] on October 2, 2015 (the "October 2015 Letter") stating that the BLM had made an administrative determination that the proposed Project was not within the scope of the ARZC ROW. Specifically, the BLM determined that the Project does not derive from or further a railroad purpose. Accordingly, in order for the Project to proceed, Cadiz, ARZC, and/or other parties would require BLM authorization for a new right-of-way authorization under the FLPMA and an environmental review under NEPA.

25. On this news, shares of Cadiz fell $2.99 per share, or nearly 38% on unusually heavy volume, to close at $4.91 per share on October 5, 2015.

26. Over the next three days, various articles were published regarding Defendants, their political connections, and the likely failure of the Project. On these news, shares of Cadiz fell an additional $1.32, or nearly 27%, on unusually heavy volume, to close at $3.59 per share on October 8, 2015.

27. On October 9, 2015, the Company issued a press release confirming BLM's determination that the proposed Project was not within the scope of the ARZC ROW and in an effort to stem its declining stock price, denounced the news reports and insisted that the BLM's decision was "contrary to federal law and policy."

---

[3] The *Seeking Alpha* Report is attached as Exhibit 1.

[4] The October 2015 Letter and the BLM's Summary Evaluation are attached as Exhibit 2. A link to download the October 2015 Letter was supplied on Cadiz's website.

28. On this news, shares of Cadiz fell $0.58 per share, over 16% on unusually heavy volume, to close at $3.01 per share on October 9, 2015.

## JURISDICTION AND VENUE

29. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

30. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

31. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, the Company has its principal executive offices and conducts business within this District.

32. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

33. Lead Plaintiff Nickolas Van Wingerden purchased Cadiz common stock at artificially inflated prices during the Class Period and has been damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

34. Lead Plaintiff Brian Kovar purchased Cadiz common stock at artificially inflated prices during the Class Period and has been damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

35. Cadiz is a Delaware corporation with its principal executive offices at 550 South Hope Street, Suite 2850, Los Angeles, California. The Company is a land and water resource development company. During the Class Period, the Company's stock was traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "CDZI."

36. Defendant Scott S. Slater ("Slater") has been the Company's President since April 12, 2011 and Chief Executive Officer ("CEO") since February 1, 2013. Defendant Slater has been a member of Cadiz's Board of Directors since February 2012 and General Counsel of the Company since November 2008. Defendant Slater is also a shareholder at the law firm of Brownstein Hyatt Farber Schreck ("Brownstein") with a practice focus on water law and policy. Pursuant to the Company's November 24, 2008 engagement letter with Brownstein, the Company paid Brownstein a fee of $500,000 in the form of Cadiz common stock based on the signing of deal term sheets for more than 51% of the Project's annual capacity. On January 9, 2013, Cadiz and its wholly owned subsidiary, Cadiz Real Estate LLC entered into a revised engagement letter with Brownstein for Defendant Slater's services in developing the Project and compensating Brownstein $25,000 per month for legal services as well as incentive compensation of Cadiz common stock for certain milestones achieved.[5] Defendant Slater is also a member of the Board of

---

[5] The incentive compensation payable to Brownstein includes: (i) a fee of 100,000 shares of Cadiz common stock to expand the level of services provided by Brownstein to the Company beyond those previously required under the 2008 Letter; (ii) a fee of 100,000 shares of Cadiz common stock upon receipt by the Company of a final judicial order dismissing all legal challenges to the Final Environmental Impact Report for the Cadiz Water Project; (iii) a fee of 100,000 shares of Cadiz common stock upon the signing of binding agreements for more than 51% of the Project's annual capacity and payable three years from the date of signing; and (iv) a fee of 100,000 shares of Cadiz common stock upon the commencement of construction of construction of all of the major facilities contemplated in the Final Environmental Impact Report necessary for the completion and delivery of the Cadiz

Directors of Limoneira Company ("Limoneira"). On February 6, 2015, the Company announced that Cadiz and Limoneira expanded their July 2013 lease agreement to increase Limoneira's lemon acreage on the Cadiz/Fenner Property.

37. Defendant Timothy J. Shaheen ("Shaheen") has been the Company's Chief Financial Officer ("CFO") since November 19, 2008 and has been a member of the Board of Directors since March 1999. Defendant Shaheen is also the Chairman and CEO of the Board of Managers of Cadiz Real Estate LLC, a wholly-owned subsidiary of the Company. In addition, Defendant Shaheen is a principal of Difinity Capital Partners LLP, a private investment partnership. Defendant Shaheen was also the sole member and manager of AG Derivatives, L.L.C. ("AG"), which provided consulting services to Cadiz for an unspecified period of time since January 1, 2008. According to the January 1, 2008 consulting agreement between AG and Cadiz, Cadiz would pay AG $12,5000 per month for Defendant Shaheen's consulting services in addition to his compensation as a member of the Company's Board of Directors.

38. Defendant Keith Brackpool ("Brackpool") is a co-founder of Cadiz and has been the Chairman of the Board of Directors since 2001. Defendant Brackpool served as the Company's CEO from December 1991 to January 2013. In addition, Defendant Brackpool is a member of the Board of Directors of the Stronach Group, a thoroughbred racing and gaming company, and Chairman of its West Coast operations. Defendant Brackpool is also a principal of 1334 Partners L.P., a partnership that owns commercial real estate in California. In 1983, Defendant Brackpool pleaded guilty in London to criminal charges that included dealing in securities without a license.

---

Water Project, including wellfield, power distribution, 43 mile pipeline, and connection to aqueduct.

39. Defendants Slater, Shaheen, and Brackpool are collectively referred to hereinafter as the "Individual Defendants."

40. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f) approved or ratified these statements in violation of the federal securities laws.

41. As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

42. Cadiz is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

43. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Cadiz under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

44. BLM is a federal agency that oversees and administers the use of public lands in the U.S., which includes the granting of right-of-ways on such land.

45. In 1875, the General Railroad Right of Way Act of March 3, 1875 (the "1875 Act") was enacted. It granted railroad companies a 100 foot right-of-way on public land on either side of a railroad line, subject to certain terms and conditions.

46. ARZC began its operations between 1903 and 1907. It operates a railroad line along the center line of an approximately two hundred foot (200') wide right-of-way between points near Cadiz and Freda, San Bernardino County, California.

47. In 1969, NEPA was enacted. NEPA established a public, interdisciplinary framework for federal decision-making to ensure that all federal agencies such as the BLM assess the environmental impact of their proposed actions when considering federal actions.

48. In 1976, FLPMA was enacted. It repealed the various railroad right-of-way statutes but recognized existing right-of-ways established under those statutes as valid existing rights. The FLPMA authorizes the Secretary of the Interior to grant, issue or renew right-of-ways with respect to public lands.

49. An M Opinion is a formal opinion written by the Solicitor that presents the official legal interpretation of the Department on matters within its jurisdiction.

50. In 1989, the Solicitor issued Opinion M-36964, which arose out of MCI Communication's request to install a fiber optic line within three different right-of-ways across BLM land held by the Southern Pacific Railroad Company ("Southern Pacific"). With respect to Southern Pacific's right-of-way pursuant to the 1875 Act, it

concluded that its interest that was "tantamount" to a fee. Therefore, it would undertake or authorize any activity within these right-of-ways so long as it did not interfere with railroad operations.

51. On September 17, 2008, Cadiz and ARZC entered into a 99 year lease for Cadiz to use the ARZC ROW, which was granted pursuant to the 1875 Act (the "Longitudinal Lease Agreement").

52. On November 4, 2011, the Solicitor issued Opinion M-37025, which withdrew portions of Opinion M-36964 regarding the 1875 Act because they were inconsistent with longstanding Supreme Court precedent. The review of Opinion M-36964 was prompted in part by the Project. Opinion M-37025 stated, in relevant part:

> Our review of Opinion M-36964 responds to … (2) concerns raised in connection with a proposal by Cadiz, Inc., to construct the Cadiz Water Conservation & Storage Project ("Cadiz Project"), which includes the construction of a 42-mile water conveyance pipeline in the Mojave Desert within the Arizona & California Railroad Company's (ARZC) 1875 Act ROW.

53. Opinion M-37025 stated that a railroad's authority to authorize other activities within an 1875 Act right-of-way is limited to those activities that derive from or further a "railroad purpose." The BLM determines whether a proposed use of an existing right-of-way falls within a railroad purpose. Those activities that are not related to railroad purposes are outside the scope of the right-of-way and require BLM approval. Such approval requires coordination with the railroad to ensure such uses do not interfere with railroad operations within the right-of-way.

54. On December 5, 2011, SMWD issued a draft Environmental Impact Report ("EIR") describing the Project.

55. In December 2011, Cadiz and ARZC also amended their Longitudinal Lease Agreement to reference Opinion M-37025 and incorporate six design features that they claim would derive and further railroad purposes, which includes:

- fire hydrants placed along railroad tracks for fire suppression;
- access road to be constructed on leased area for railroad company for maintenance purposes or in case of emergencies such as rail car derailment;
- access to 10,000 gallons of water per day for vegetation control, washing rail cars, offices, and other contemplated improvements;
- access to power at meters located along the railroad tracks and emergency access to power at any location;
- water service for steam powered locomotives, to be used as excursion trains; and
- right to connect and deliver water to any future water production facilities within the ROW to the pipeline and facilities.

56. On December 2, 2011, the BLM issued interim guidance in response to Opinion M-37025 (the "Instruction Memorandum No. 2012-038").

57. Instruction Memorandum No. 2012-038 reiterated that BLM retains authority over proposed uses within 1875 Act right-of-ways across BLM managed public lands. The BLM must evaluate whether a railroad purpose will be served by any such proposed use. Proponents of such uses that are not derived from or in furtherance of a railroad purpose will need authorization from the BLM.

58. On December 23, 2011, the 2012 Appropriations Act was enacted. Division E, Title I, Section 118 of the 2012 Appropriations Act lists the "Prohibition on Use of Funds" in relation to the BLM. The 2012 Appropriations Act stated, in relevant part:

> (a) Any proposed new use of the Arizona & California Railroad Company's Right of Way for conveyance of water shall not proceed unless the Secretary of the Interior certifies that the proposed new use is within the scope of the Right of Way.

> (b) No funds appropriated or otherwise made available to the Department of the Interior may be used, in relation to any proposal to store water underground for the purpose of export, for approval of any right-of-way or similar authorization on the Mojave National Preserve or lands managed by the Needles Field Office of the Bureau of Land Management, or for carrying out any activities associated with such right-of-way or similar approval.

59. Subsequent appropriations acts enacted—the 2013 Appropriations Act, the 2014 Appropriations Act, and the 2015 Appropriations Act—all continued to direct the Secretary of the Interior to determine if Cadiz's pipeline falls within the scope of the ARZC ROW and specified that no appropriated funding should be spent towards approving a right-of-way related to the Project.

60. Therefore under Opinion M-37025, a BLM finding that the Project does not fall within the scope of the AZRC ROW would require a FLPMA ROW authorization from BLM, which would entail a costly federal review process, including an environmental review under NEPA. However, the 2012 Appropriations Act and each subsequently enacted Appropriations Act through the 2015 Appropriations Act expressly prohibit any Departments funds to be used in the processing of such a BLM authorization. Thus, a BLM determination that the Project does not fall within the scope of the AZRC ROW would be fatal to the project.

61. On July 13, 2012, SMWD issued the Final EIR describing the Project.

62. Unbeknownst to the investing public, the BLM held a meeting on August 23, 2012 with ARZC, SMWD, and Cadiz representatives, including Defendant Slater, who presented plans for the Project's proposed water pipeline and access road along 43 miles of ARZC's existing right-of-way on public lands.

63. Also unbeknownst to the investing public, the BLM sent a letter on December 19, 2012 to Rail America, Inc., the former parent company of ARZC and Defendants Cadiz and Slater as a follow up to the meeting held on August 23, 2012

(the "December 2012 Letter").[6] BLM stated in the letter, in relevant part:

> As we have previously stated, ***presently available information provided by ARZC does not support a determination that the water pipeline and access road are within the scope of the railroad right-of-way.***

(Emphasis added).

64. Thus, no later than December 2012 and perhaps as early as August 2012, ARZC and Defendants Cadiz and Slater knew that BLM had found that information provided to BLM did not support a determination that Cadiz's proposed pipeline and access road were within the scope of the ARZC ROW. Without BLM approval, Cadiz's pipeline project would be infeasible because extensive and costly federal review would be required, but the 2012-2015 Appropriations Acts each specified that no funding appropriated to the Department could be spent towards approving a right-of-way related to the Project.

65. Also unbeknownst to the investing public, Defendant Slater sent a letter on July 12, 2013 to the BLM to request that the BLM determine the Project will further railroad purposes and is within the scope the ARZC ROW (the "July 2013 Letter").[7] Defendant Slater stated in part:

> In your December 19, 2012 to RailAmerica, Inc., you stated that, in BLM's view, the "presently available information about Cadiz, Inc.'s proposal to install a water pipeline in an 1875 Act right-of-way owned by Arizona & California Rail Company (ARZC)[1] "does not support a determination that the water pipeline and access road are within the scope of railroad right-of-way." Accordingly, you requested that "the

---

[6] The December 2012 Letter was included in the *Seeking Alpha* Report in its entirety and is attached as Exhibit 3. Plaintiffs independently obtained a copy of the December 2012 Letter through a Freedom of Information Act ("FOIA") request to BLM to verify its contents.

[7] The July 2013 Letter is included in the *Seeking Alpha* Report in its entirety and is attached as Exhibit 4. Plaintiffs independently obtained a copy of the July 2013 Letter through a FOIA request to BLM to verify its contents.

> parties involved with the Cadiz project work cooperatively with the BLM to provide additional facts concerning [the Project], including responses to unanswered questions from the [August 23, 2012] meeting agenda." We are pleased to report that on January 16, 2013, the parties provided the requested information, and that they also met with your staff on February 27, 2013 to discuss the information. ***Unfortunately, to our knowledge, the position of BLM's staff has not changed; they continue to assert as they did last July, that construction activities in the right-of-way "would be a willful trespass."***

(Emphasis added).

66. Stated differently, no later than July 12, 2013, Defendants Slater and Cadiz knew the BLM had not changed its determination that the Project is not within the scope of the ARZC ROW.

67. On August 11, 2014, the BLM issued Instruction Memorandum No. 2014-122 to implement Opinion M-37025, replacing Instruction Memorandum No. 2012-038. Instruction Memorandum No. 2014-122 again reiterated that BLM retains authority over proposed uses within 1875 Act right-of-ways across BLM managed public lands. Accordingly, the BLM must evaluate whether a railroad purpose will be served by any such proposed use and those uses that are not derived from or further a railroad purpose will require BLM authorization.

**Defendants' Materially False and Misleading Statements Concerning the Project**

68. On March 10, 2014, after the market closed, the Company filed a materially false and misleading Form 10-K for the year ended December 31, 2013 (the "2013 10-K") with the SEC.

69. In the 2013 10-K, the Company claimed the Project would serve "a variety of railroad purposes," stating, in relevant part:

> In September 2008, we secured a right-of-way for the Water Project's water conveyance pipeline by entering into a lease agreement with the Arizona & California Railroad Company ("ARZC"), which operates an

> active shortline railroad extending from Cadiz to Matthie, Arizona. The agreement allows for the use of a portion of the railroad's right-of-way to construct and operate a water conveyance pipeline for a period up to 99 years. The buried pipeline would be constructed parallel to the railroad tracks and be used to convey water between our Cadiz Valley property and the CRA in Rice, California. ***The ARZC is also a Project participant and would receive water from the Project to serve a variety of railroad purposes, including fire suppression and other safety and maintenance uses.*** In addition, in September 2013, we entered into a trackage rights agreement with the ARZC that would enable the operation of steam-powered, passenger excursion trains on the line powered by water made available from the pipeline.

(Emphasis added).

70. Under Item 1A. Risk Factors section of the 2013 10-K, the Company also stated the following with regards to the Project:

> **The Development of Our Properties Is Heavily Regulated, Requires Governmental Approvals and Permits That Could Be Denied, and May Have Competing Governmental Interests and Objectives**
>
> In developing our land assets and related water resources, we are subject to local, state, and federal statutes, ordinances, rules and regulations concerning zoning, resource protection, environmental impacts, infrastructure design, subdivision of land, construction and similar matters. Our development activities are subject to the risk of adverse interpretations or changes to U.S. federal, state and local laws, regulations and policies. Further, our development activities require governmental approvals and permits. If such permits were to be denied or granted subject to unfavorable conditions or restrictions, our ability to successfully implement our development programs would be adversely impacted.
>
> The opposition of government officials may adversely affect our ability to obtain needed government approvals and permits upon satisfactory terms in a timely manner. In this regard, federal government appropriations currently preclude spending for "any proposal to store water for the purpose of export or for any activities associated with the

> approval of rights-of-way on lands managed by the Needles Field Office of the U.S. Bureau of Land Management" (the "BLM"). Federal government appropriations also direct the U.S. Department of the Interior (the "DOI") to confirm that the Water Project's proposed use of a portion of the right-of-way of the ARZC for the Project's conveyance pipeline is within the scope of ARZC's right-of-way. According to existing federal law and direction from the DOI in Memorandum Opinion M-23075, a railroad has the authority to grant third party uses within its rights-of-way without BLM approval if those uses will serve a railroad purpose. ***The Project and pipeline will further numerous railroad purposes, including fire suppression and access to water for railroad business operations, and the ARZC has provided information regarding these purposes to the BLM. As a result, we do not believe federal right-of-way approval is required to implement the Project; however, this may be subject to challenge.***
>
> Additionally, the statutes, regulations and ordinances governing the approval processes provide third parties the opportunity to challenge proposed plans and approvals. Opposition from third parties will cause delays and increase the costs of our development efforts or preclude such development entirely. In California, third parties have the ability to file litigation challenging the approval of a project, which they usually do by alleging inadequate disclosure and mitigation of the environmental impacts of the project. We are currently named as a real party in interest in six lawsuits challenging the various Water Project approvals granted to date and expect to be party to various legal proceedings arising in the general course of our business related to the development of the Water Project. While we have worked with representatives of various environmental and third party interests and agencies to minimize and mitigate the impacts of our planned projects, certain groups may remain opposed to our development plans.

(Emphasis added).

71. The 2013 10-K was signed by Defendants Brackpool, Slater, and Shaheen. Attached to the 2013 10-K were the Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Slater and Shaheen falsely attesting to the accuracy of the 2013 10-K.

72. The 2013 10-K was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

73. On May 8, 2014, the Company filed a materially false and misleading Form 10-Q for the quarterly period ended March 31, 2014 (the "1Q 2014 10-Q"). In the 1Q 2014 10-Q, the Company again claimed the Project would serve "a variety of railroad purposes," stating, in relevant part:

> In September 2008, we secured a right-of-way for the Water Project's water conveyance pipeline by entering into a lease agreement with the Arizona & California Railroad Company ("ARZC"), which operates an active shortline railroad extending from Cadiz to Matthie, Arizona. The agreement allows for the use of a portion of the railroad's right-of-way to construct and operate a water conveyance pipeline for a period up to 99 years. The buried pipeline would be constructed parallel to the railroad tracks and be used to convey water between our Cadiz Valley property and the CRA in Rice, California. ***The ARZC is also a Project participant and would receive water from the Project to serve a variety of railroad purposes, including fire suppression and other safety and maintenance uses***. In addition, in September 2013, we entered into a trackage rights agreement with the ARZC that would enable the operation of steam-powered, passenger excursion trains on the line powered by water made available from the pipeline.

(Emphasis added).

74. Under Item 1A. Risk Factors section of the 1Q 2014 10-Q, the Company also stated the following:

> **ITEM 1A. Risk Factors**
>
> There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2013.

75. The 1Q 2014 10-Q was signed by Defendants Slater and Shaheen. Attached to the 1Q 2014 10-Q were the SOX certifications signed by Defendants Slater and Shaheen falsely attesting to the accuracy of the 1Q 2014 10-Q.

76. The 1Q 2014 10-Q was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

77. On August 7, 2014, the Company filed a materially false and misleading Form 10-Q for the quarterly period ended June 30, 2014 (the "2Q 2014 10-Q"). In the 2Q 2014 10-Q, the Company again claimed the Project would serve "a variety of railroad purposes," stating in part:

> In September 2008, we secured a right-of-way for the Water Project's water conveyance pipeline by entering into a lease agreement with the Arizona & California Railroad Company ("ARZC"), which operates an active shortline railroad extending from Cadiz to Matthie, Arizona. The agreement allows for the use of a portion of the railroad's right-of-way to construct and operate a water conveyance pipeline for a period up to 99 years. The buried pipeline would be constructed parallel to the railroad tracks and be used to convey water between our Cadiz Valley property and the CRA in Rice, California. ***The ARZC is also a Project participant and would receive water from the Project to serve a variety of railroad purposes, including fire suppression and other safety and maintenance uses.*** In addition, in September 2013, we entered into a trackage rights agreement with the ARZC that would enable the operation of steam-powered, passenger excursion trains on the line powered by water made available from the pipeline.

(Emphasis added).

78. Under Item 1A. Risk Factors section of the 2Q 2014 10-Q, the Company stated the following:

**ITEM 1A. Risk Factors**

There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2013.

79. The 2Q 2014 10-Q was signed by Defendants Slater and Shaheen. Attached to the 2Q 2014 10-Q were the SOX certifications signed by Defendants Slater and Shaheen falsely attesting to the accuracy of the 2Q 2014 10-Q.

80. The 2Q 2014 10-Q was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

81. On August 13, 2014, the Company issued a press release on its website entitled "News: Cadiz Inc. Statement Regarding U.S. Department of the Interior Instruction Memorandum Pertaining to Third Party Uses of Railroad Rights-of-Way" (the "August 2014 News Update"). The August 2014 News Update stated in relevant part:

***Cadiz Project Furthers a Railroad Purpose as Required by new IM***
Today, the Bureau of Land Management (BLM) issued a long awaited Instruction Memorandum (IM) to its Field Offices regarding the "Evaluation and Approval of Activities within Railroad Rights-of-Way Granted under the General Railroad Right-of-Way Act of March 3, 1875." Pursuant to the IM, BLM will evaluate whether any activity proposed for an 1875 Act railroad right-of-way that crosses federal lands "furthers a railroad purpose." If BLM determines that it does, then the railroad or third parties authorized by it may proceed with the activity on those lands without further federal consent or involvement. If BLM determines that the proposed activity does not "further a railroad purpose," then the project proponent will have to obtain a permit from BLM to proceed.

In 2008, Cadiz entered into a 99-year lease agreement with the Arizona & California Railroad Company (ARZC) to use portions of its 1875 Act

> right-of–way for the Cadiz Valley Water Conservation, Recovery and Storage Project (Project), which will transport water by a buried pipeline from Cadiz to the Colorado River Aqueduct. The lease expressly requires that the Project further several railroad purposes and, under our lease agreement, the ARZC reserved water supplies from the planned pipeline for its operational needs as well as access to Project facilities, such as roads and power appurtenances, for the benefit of its railroad operation.
>
> Among the many benefits, including access to roads and power facilities, the Project will also make water available to ARZC along its rail line for fire suppression purposes at a time when federal concern over damage to railroads from fires as the result of spills of petroleum products and other accidents is at an all-time high. In addition, the Project will enable the operation of a steam-powered tourism-based train that will operate between Parker, Arizona and Cadiz, California.
>
> ***Since 2012, the ARZC and Cadiz have provided the BLM detailed information about the numerous railroad purposes that will be furthered by the Project and we believe our proposed use of the ARZC right-of-way fit squarely within the four corners of the new framework.*** We are therefore hopeful that we will receive a speedy determination from the BLM under its new IM that the Project may proceed on ARZC's right-of-way without further federal consent or involvement.

(Emphasis added).

82. The August 2014 News Update was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

83. On November 6, 2014, the Company filed a materially false and misleading Form 10-Q for the quarterly period ended September 30, 2014 (the "3Q 2014 10-Q"). Under Item 1A. Risk Factors section of the 3Q 2014 10-Q, the Company stated the following:

> **ITEM 1A. Risk Factors**
>
> There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2013.

84. The 3Q 2014 10-Q was signed by Defendants Slater and Shaheen. Attached to the 3Q 2014 10-Q were the SOX certifications signed by Defendants Slater and Shaheen falsely attesting to the accuracy of the 3Q 2014 10-Q.

85. The 3Q 2014 10-Q was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

86. On March 9, 2015, the Company filed a materially false and misleading Form 10-K for the year ended December 31, 2014 (the "2014 10-K") with the SEC. The 2014 10-K states in relevant part:

> **The Development of Our Properties Is Heavily Regulated, Requires Governmental Approvals and Permits That Could Be Denied, and May Have Competing Governmental Interests and Objectives**
>
> In developing our land assets and related water resources, we are subject to local, state, and federal statutes, ordinances, rules and regulations concerning zoning, resource protection, environmental impacts, infrastructure design, subdivision of land, construction and similar matters. Our development activities are subject to the risk of adverse interpretations or changes to U.S. federal, state and local laws, regulations and policies. Further, our development activities require governmental approvals and permits. If such permits were to be denied or granted subject to unfavorable conditions or restrictions, our ability to successfully implement our development programs would be adversely impacted.
>
> The opposition of government officials may adversely affect our ability to obtain needed government approvals and permits upon satisfactory terms in a timely manner. In this regard, federal government

appropriations currently preclude spending for "any proposal to store water for the purpose of export or for any activities associated with the approval of rights-of-way on lands managed by the Needles Field Office of the U.S. Bureau of Land Management" (the "BLM"). Federal government appropriations also direct the U.S. Department of the Interior (the "DOI") to confirm that the Water Project's proposed use of a portion of the right-of-way of the ARZC for the Project's conveyance pipeline is within the scope of ARZC's right-of-way. According to existing federal law and direction from the DOI in Memorandum Opinion M-23075, a railroad has the authority to grant third party uses within its rights-of-way without BLM approval if those uses will serve a railroad purpose. ***The Project and pipeline will further numerous railroad purposes, including fire suppression, access to water for business operations, hydropower generation creating additional transloading opportunities, as well as increased traffic among other benefits, and the ARZC has provided information regarding these purposes to the BLM. As a result, we do not believe federal right-of-way approval is required to implement the Project; however, this may be subject to challenge.***

Additionally, the statutes, regulations and ordinances governing the approval processes provide third parties the opportunity to challenge proposed plans and approvals. Opposition from third parties will cause delays and increase the costs of our development efforts or preclude such development entirely. In California, third parties have the ability to file litigation challenging the approval of a project, which they usually do by alleging inadequate disclosure and mitigation of the environmental impacts of the project. We expect to be party to various legal proceedings arising in the general course of our business related to the development of the Water Project. We are currently named as a real-party-in-interest in six lawsuits before the California Court of Appeals, 4th District. These lawsuits seek to overturn the rulings issued by Orange County Superior Court in October 2014 which upheld all of the Water Project approvals granted to date and denied all claims against the Project. While we have worked with representatives of various environmental and third party interests and agencies to minimize and mitigate the impacts of our planned projects, certain groups may remain opposed to our development plans and pursue legal action.

(Emphasis added).

87. The 2014 10-K was signed by Defendants Brackpool, Slater, and Shaheen. Attached to the 2014 10-K were the SOX certifications signed by Defendants Slater and Shaheen falsely attesting to the accuracy of the 2014 10-K.

88. The 2014 10-K was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

89. On April 21, 2015, the *Seeking Alpha* Report was published on the investor news website *SeekingAlpha.com*, which revealed the following in asserting that the Project has effectively failed:

- BLM's determination that the Project's proposed pipeline does not meet a "railroad purpose" in conjunction with the 2012 Appropriations Act renders the Project unviable.
- BLM is not convinced that the Project's proposed pipeline is within the scope of the ARZC ROW based on the information provided to date and disagreed with the Final EIR's statement that "BLM approval is not required for the Project's use of the railroad right-of-way" in a letter dated July 24, 2012 to the SMWD;
- BLM reiterated its position that the Project's proposed pipline is not within the scope of the ARZC ROW based on presently available information provided by the ARZC in the December 2012 Letter; and
- The Company acknowledged in the July 2013 Letter that BLM's previously findings that the Project's pipeline does not serve a "railroad purpose" and continued to maintain its determination even after the Company provided additional information.

90. Specifically, the *Seeking Alpha* Report stated, in relevant part, the following with regards the project being unviable:

> There are two issues I believe are absolutely critical to understand. First, if at any point CDZI is forced into a "NEPA" federal review, there is a deliberately written "landmine" hidden in past House Appropriations bills apparently prohibiting the BLM from dedicating money or time towards reviewing the CDZI issue. This effectively kills the Cadiz project upon NEPA federal review because the project instantly gets pushed into "regulatory purgatory" requiring a permit that the government is not allowed to work on.
>
> This "landmine" was initiated in 2011:

PROHIBITION ON USE OF FUNDS

SEC. 114. (a) Any proposed new use of the Arizona & California Railroad Company's Right of Way for conveyance of water shall not proceed unless the Secretary of the Interior certifies that the proposed new use is within the scope of the Right of Way.

(b) No funds appropriated or otherwise made available to the Department of the Interior may be used, in relation to any proposal to store water underground for the purpose of export, for approval of any right-of-way or similar authorization on the Mojave National Preserve or lands managed by the Needles Field Office of the Bureau of Land Management, or for carrying out any activities associated with such right-of-way or similar approval.[40]

> (Picture credit 2011 appropriations bill)
>
> It also seems <u>the BLM has been very clear</u> with Cadiz what this means:

If a decision is made that the proposed use <u>is not</u> within the scope of the 1875 railroad ROW, such a pipeline would require a FLPMA ROW authorization from the BLM as it crosses BLM-managed lands. However, the processing of such a ROW would be prohibited this year, given the language in the 2012 Consolidated Appropriations Act H.R. 2055 118(b).

> (2012-6/27 FOIA obtained BLM Cadiz briefing paper)
>
> Even if somehow CDZI can navigate around this appropriations wall (no way) then CDZI is still dead anyway. CDZI has just $16m in cash with -$10m estimated annual losses and $35m in debt maturing next year.

There is obviously no way CDZI will survive the expensive and drawn out nature of federal reviews which typically take many years and cost tens of millions of dollars while "resetting the clock" for environmental and Tetra Tech legal opposition, which will drag out into eternity.

The second dynamic to understand is how I believe CDZI was trying to dodge this "game over" federal review.

**CDZI Failure Context and Background**

Railroads historically had considerable leeway regarding what they could do on Right of Ways (ROWs) and even though they operate on public land belonging to the federal government, railroads had virtually zero permitting, environmental review or accountability. This created problems as railways increasingly pushed the limits of the law by putting clearly unrelated assets and businesses along these ROWs while environmental standards have increased exponentially.

This changed with a transformational "M-decision" of 2011, tellingly driven as a direct response to Cadiz.

> Our review of Opinion M-36964 responds to (1) criticisms of the 1875 Act portion of Opinion M-36964 by a federal District Court in *Home on the Range v. AT&T Corporation*, 386 F. Supp. 2d 999 (D. Ind. 2005), and (2) concerns raised in connection with a proposal by Cadiz, Inc., to construct the Cadiz Water Conservation & Storage Project ('Cadiz Project'), which includes the construction of a 42-mile water conveyance pipeline in the Mojave Desert within the Arizona & California Railroad Company's ('ARZC') 1875 Act ROW.[1] The Acting Assistant Secretary, Water and Science, relied on Opinion M-36964 in 2009 to conclude that the ARZC 'may allow others to use. [its 1875 Act] ROW for any purpose without the involvement of the

(Credit BLM documents)

What this "M decision" did was give the BLM unrestricted decision making ability, on a case-by-case basis, to decide what is reasonable to allow on federal ROW without federal review. Even more critical, if there are any doubts about a ROW then the decision must be resolved in favor of the federal government (ie: requires review).

Since this law was changed in direct response to Cadiz's attempted ROW water pipeline, what do you think that means regarding how the Cadiz decision was going to go?

With this in mind, the publicly available FOIA'd BLM communications show some interesting commentary which seems to obviously demonstrate CDZI failed to show, without doubts, the CDZI project does not require federal review.

> railroad line and no additional detail defining "future proposed uses." At this time, BLM is not convinced that the 7 foot diameter water pipeline and appurtenant uses described in section 2.3.2 of the EIR are within the scope of the railroad right-of-way. It is BLM's responsibility to ensure the public

(2012-7/24 FOIA obtained BLM Cadiz briefing paper)

And then goes on to further explain any statement claiming any statement claiming BLM approval is not required is not accurate (obviously meaning BLM approval is required):

> discuss the water pipeline right-of-way associated with the Cadiz Project. In Section 3.13.2, it is stated that "BLM approval is not required for the Project's use of the railroad right-of-way." This statement is not accurate based upon BLM's assessment of information provided, to date, by parties involved with the Cadiz Project. In written correspondence from the Arizona & California Railroad Co (ARZC), we

(2012-07/24 BLM EIR comment letter to Cadiz partner SWMD)

In case you think I am biased and this is some one-off document, or perhaps Cadiz CEO Scott Slater was unaware, let me show you more BLM public documents obtained through FOIA request.

* * *

Further supporting my point CDZI knew they had not proven their case to the BLM, we have this 2013-07/12 letter from CDZI CEO Scott Slater protesting to the BLM on this topic where he apparently acknowledges the insurmountable disaster.

> In your December 19, 2012 letter to RailAmerica, Inc., you stated that, in BLM's view, the "presently available information" about Cadiz, Inc.'s proposal to install a water pipeline in an 1875 Act right-of-way owned by Arizona & California Rail Company (ARZC)[1] "does not support a determination that the water pipeline and access road are within the scope of the railroad right-of-way." Accordingly, you requested that "the parties involved with the Cadiz Project work cooperatively with the BLM to provide additional facts concerning [the Project], including responses to unanswered questions from the [August 23, 2012] meeting agenda." We are pleased to report that on January 16, 2013, the parties provided the requested information, and that they also met with your staff on February 27, 2013 to discuss the information. Unfortunately, to our knowledge, the position of BLM's staff has not changed; ... pipeline construction activities in the right-of-way

(Publicly available BLM document)

Even more telling, in this letter CDZI CEO Scott Slater even seems to confirm the primary "driving" purpose of the CDZI pipeline is to convey water to the CRA (ie: the pipeline does not originate from any ARZC need for water, and not there to convey water to ARZC)

> Conservation, Recovery and Storage Project (Cadiz Project) ... therefore within the scope of the Arizona and California Railroad's (ARZC's) right-of-way. By design, the Cadiz Project would entail laying a pipeline, underground, along the ARZC right-of-way for the conveyance of water to and from the Colorado River Aqueduct.

(Publicly available BLM document)

It seems irrefutable to me CDZI failed in their case to prove to the BLM and the public that they should not be required to face a proper federal review. and that the CDZI team with CEO Scott Slater has known the true nature of this since at least 2012.

Has Cadiz properly communicated this interaction to investors?

91. On this news, the Company's stock fell $1.05 per share, nearly 11% over the next two days, to close at $8.65 per share on April 22, 2015, on unusually heavy trading volume, damaging investors.

92. On May 8, 2015, the Company filed a materially false and misleading Form 10-Q for the quarterly period ended March 31, 2015 (the "1Q 2015 10-Q"). Under Item 1A. Risk Factors section of the 1Q 2015 10-Q, the Company stated the following:

> There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2014.

93. The 1Q 2015 10-Q was signed by Defendants Slater and Shaheen. Attached to the 1Q 2015 10-Q were the SOX certifications signed by Defendants Slater and Shaheen falsely attesting to the accuracy of the 1Q 2015 10-Q.

94. The 1Q 2015 10-Q was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

95. On August 6, 2015, the Company filed a materially false and misleading Form 10-Q for the quarterly period ended June 30, 2015 (the "2Q 2015 10-Q"). Under Item 1A. Risk Factors section of the 2Q 2015 10-Q, the Company stated the following:

> There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2014.

96. The 2Q 2015 10-Q was signed by Defendants Slater and Shaheen. Attached to the 2Q 2015 10-Q were the SOX certifications signed by Defendants Slater and Shaheen falsely attesting to the accuracy of the 2Q 2015 10-Q.

97. The 2Q 2015 10-Q was materially false and misleading because it failed to disclose BLM's repeated findings that the Project's proposed pipeline is not within the scope of the ARZC ROW. Because of the cost and funding prohibitions, such a BLM determination would render the Project infeasible.

**Disclosures at the End of the Class Period**

98. On October 5, 2015, the Company issued a press release on its website entitled "Press Release: Cadiz Inc. Announces Guidance from U.S. Bureau of Land Management Regarding Cadiz Water Project's Proposed Use of a Railroad ROW,"

which revealed it had indirectly received a letter from the BLM setting forth BLM's determination that the proposed Project is outside the scope of the ARZC ROW. Therein, the Company stated, in relevant apart:

> Cadiz Inc. (NASDAQ: CDZI) ("Cadiz", the "Company") announced today that it has indirectly received a copy of correspondence dated October 2, 2015 addressed to the Company from the California State Director of the U.S. Bureau of Land Management ("BLM") related to the Cadiz Valley Water Conservation, Recovery and Storage Project's ("Project") proposed use of a portion of the Arizona and California Railroad's 1875 Act right-of-way ("ROW") for its water conveyance pipeline and related facilities. ***The letter explains that BLM has determined that the Project's proposed use, as described to the BLM to date, is outside the scope of the ROW and therefore would require a BLM permit before proceeding.*** However, the letter notes that the determination is not a final action and is subject to reconsideration upon the submittal of new information.
>
> The Cadiz Water Project is a public-private partnership that will conserve water presently lost to evaporation and create a new water supply for 400,000 people a year. The Project will also further several railroad purposes through the installation of a 43 mile pipeline by: (1) providing power developed from an "in-line turbine" for the railroad's exclusive use to light sidings, operate crossings and carry-out transloading activities; (2) delivering information and safety systems derived from the Project's fiber-optic cable; (3) installing an automated fire suppression system with water and storage at various points along the 43- mile pipeline; (4) operating a tourist based steam engine reflective of the original and historic use of the railroad; and (5) making available a new access road for maintenance and crew-shifts.
>
> In 2011, the Solicitor of the U.S. Department of the Interior, which oversees BLM, opined that "railroads have the right to undertake [and authorize others to undertake] a range of activities within their [1875 Act] ROWs, including commercial activities, so long as the activity derives from or furthers [at least in part] a railroad purpose." The Oct 2, 2015 BLM correspondence appears to disregard the framework of the

> 2011 Opinion and the Company will immediately seek to clarify and if necessary rescind the BLM determination.
>
> As the Company continues to move forward to secure legal clarification of its right to access the ARZC ROW, it will continue to complete the remaining milestones for the Project. The Project has also already passed strict scrutiny under the California Environmental Quality Act – the toughest environmental law in the U.S. The Project was independently approved by both the Santa Margarita Water District ("SMWD") and the County of San Bernardino ("County") in 2012 and this review was subsequently sustained in 6 sweeping trial court victories against all challenges in 2014. Appeals of these cases have been fully briefed and are awaiting oral argument, which is expected to occur in the 4th Quarter of 2015. SMWD, the County and the Company were recently joined in defense of the trial court decisions by a diverse group of amicus curie interests.
>
> The Project has also made significant engineering progress this year, having mapped the approved wellfield, drilled numerous test wells and advanced water treatment plans. Information sharing between SMWD and the Metropolitan Water District of Southern California ("MWD") also continues, and given the progress made, the Company anticipates board review by MWD later in the 4th Quarter of 2015 or 1st Quarter of 2016.
>
> The Project enjoys broad and growing support from State and Federal elected officials as well as community, business, and labor groups. Most recently, U.S. Representatives Linda Sanchez (D-CA, 38) and Tony Cardenas (D-CA, 29) joined the growing list of bipartisan Congressional support for the project, which already includes Col. Paul Cook (R-Yucca Valley), Jim Costa (D-Fresno), Duncan Hunter (R-El Cajon), Darrell Issa (R-Vista), Scott Peters (D-San Diego), Ed Royce (R-Hacienda Heights), and Mimi Walters (R-Laguna Niguel). Last week, seven water districts in Southern California also expressed their support for the project.
>
> The Company remains committed to completing the Project on schedule with deliveries of water projected to begin in 2017.

(Emphasis added).

99. The October 5, 2015 press release included a link to the October 2015 Letter, attached in full as Exhibit 2. The October 2015 Letter from the BLM revealed the rationale for its determination that the Project is outside the scope of the ARZC ROW, stating in relevant part:

> ***BLM has reached an administrative determination that the Project as described cannot be authorized by ARZC because it is outside the scope of ARZC's ROW grants held under the 1875 Act.*** As shown in the enclosed summary, BLM has determined that the Project does not derive from or further a railroad purpose. By determining the primary objective of the Project and how the railroad purpose interrelates, BLM examined "the nature and extent of the non-railroad benefits of an activity relative to the railroad purpose of the same activity" to provide for an overall evaluation of the Project.
>
> ***In order to proceed with the proposed Project, Cadiz, Inc., ARZC, or other parties involved will require BLM authorization for a right-of-way for the Project under the regulations set forth in 43 C.F.R. Part 2800.*** An SF-299 application is enclosed for your convenience. However, if additional information becomes available regarding the Project or if the information relating to the Project changes, an evaluation based on new information could result in a different determination by the BLM. Where the BLM has already completed the evaluation process, additional evaluations may be undertaken where appropriate and in the public interest given available BLM resources.
>
> ARZC has a continuing obligation to notify the BLM of existing and new activities undertaken within their ROWs held under the Act. Any determination made with respect to any particular activity is limited to the facts before the BLM at the time of such determination.
>
> This administrative determination is not a final agency decision and therefore not subject to appeal under 43 C.F.R. Part 4 (BLM Manual Sections 1841.1.D. and 1841.15) because it does not determine any final rights or obligations, does not constitute authorization or disapproval of any particular activity, nor do legal consequences for the activity in question flow from this administrative determination. ***Note that proceeding with new activities or continued activities found not to be***

> ***within the scope of the ROWs without authorization from the BLM could result in the BLM instituting trespass proceedings.***

(Emphasis added).

100. On this news, shares of Cadiz fell $2.99 per share, or nearly 38% on unusually heavy volume, to close at $4.91 per share on October 5, 2015.

101. On October 5, 2015, after the market closed, KCET, an independent public news station, published an article on their website entitled, "Major Setback for Desert Water Project," which revealed U.S. Geological Survey's likely opposition to the proposed Project during its imminent federal environmental review. Therein, the article stated, in relevant part:

> A proposal to pump water from the desert for use in Southern California suburbs suffered a blow Friday, as a Bureau of Land Management official recommended against granting the project's backers permission Friday to use an existing rail corridor to pipe water to the Metropolitan Water District's aqueduct.
>
> The company Cadiz, Inc. wants to pump up to 50,000 acre-feet a year -- more than 16 billion gallons -- from an aquifer in the Mojave Desert to sell to a consortium of Southern California water providers, led by Orange County's Santa Margarita Water District. Opponents claim the project could cause irreversible damage to the Mojave Desert's ecosystem, drying up springs by lowering the level of the aquifer.
>
> Cadiz counters that the project would actually salvage water that would otherwise be lost to evaporation, and that it would only take 30 years for the aquifer to refill after they're done pumping. It's that scientific dispute that makes Friday's finding by the BLM potentially catastrophic for Cadiz.
>
> The Bureau of Land Management's California State Director Jim Kenna told Cadiz officials in a letter Friday that use of the railroad right of way for Cadiz's pipeline doesn't "further a railroad purpose." In essence, the seemingly minor "administrative determination" means the company will likely have to put its project through a full federal environmental

review if it's going to proceed. And that means federal hydrologists will cast a critical eye on the company's claims, and that may kill the project.

Cadiz had argued that its proposed 43-mile pipeline along the right-of-way of the Arizona California Railroad (AZCR) would have augmented the safety of railroad operations, by providing water for firefighting along the railroad's right of way through one of the least-vegetated sections of the Mojave, as well as drinking and cooling water for possible passenger excursions. If that argument had flown, Cadiz could have taken advantage of a loophole of sorts that would have exempted the pipeline -- and thus the whole project -- from federal environmental review. Cadiz is asking that the determination by California BLM chief Jim Kenna be reviewed by Kenna's boss, BLM Director Neil Kornze, but the chances that Kornze would countermand Kenna's call are slender.

* * *

But the only way USGS would weigh in is if the project required federal environmental review under the National Environmental Policy Act, whose Environmental Impact Statements (EISs) are the counterpart to the California Environmental Quality Act's Environmental Impact Reviews (EIRs). And in order to trigger federal review of the project, there has to be federal involvement: funding, agency participation, or some other way in which federal agencies would take part in carrying the project out.

One of the usual triggers for federal environmental assessment is involving federal land somehow, either because the project is sited on federal land or because it involves roads, transmission lines, or pipelines that cross federal land. Cadiz's wells would be on private land, but getting water from those wells to the MWD's aqueduct involves crossing about 40 miles of public land in the Mojave Desert. That would trigger the EIS process which in turn would involve the USGS, which agency would likely have unflattering things to say about Cadiz's claims.

Cadiz may have had other reasons for trying to use the 43-mile right-of-way of the Arizona and California Railroad (AZRC) for its pipeline route. But by choosing that route, Cadiz was able to make the case that

> its pipeline would have fulfilled functions essential to the running of the railroad, thus escaping the environmental review provisions of NEPA.
>
> As an "administrative determination" rather than a final decision by the BLM. Kenna's letter Friday isn't a slam dunk death blow for the Cadiz project. But as Kornze is unlikely to overrule Kenna, Cadiz will likely have to decide whether it wants to put its scientific claims up against those of the USGS by going the NEPA Environmental Impact Statement route.
>
> And at the very least, that means another couple years of delay for a water project whose backers hoped to break ground more than a decade ago.

102. Also on October 5, 2015, after the market closed, the *Los Angeles Times* published an article entitled, "BLM decision sets back Cadiz plan to sell Mojave groundwater," which revealed that the prohibition on appropriating funding towards approving a right-of-way related to the proposed Project will continue. Therein, the article stated, in relevant part:

> Cadiz Inc.'s plans to sell Mojave Desert groundwater to Southern California communities have hit a major federal roadblock.
>
> In a long-awaited decision, the U.S. Bureau of Land Management says Cadiz cannot use an existing railroad right-of-way for a new water pipeline that would carry supplies from the project's proposed well field to the Colorado River Aqueduct.
>
> By using the railroad right-of-way, Cadiz had hoped to escape federal environmental review of the 43-mile pipeline, one of the project's most expensive components.
>
> But in a letter to Cadiz on Friday, BLM's California director informed the company that it needs U.S. approval for a separate pipeline right-of-way over federal land. That would trigger review under federal environmental law, a potentially lengthy and costly process that could impose new conditions on the project.

Cadiz has acknowledged that over the long term, the project will extract more groundwater than is replenished by nature. And federal scientists have expressed concern that the operation could dry up springs vital to wildlife on the nearby Mojave National Preserve and other public lands.

"The BLM has the responsibility to objectively apply the law using the best available information to determine what rights were conveyed to the railroad under a 19th century law," BLM State Director Jim Kenna said in a statement. "Because the proposed pipeline is not within the rights conveyed to the railroad, a separate BLM authorization is necessary."

In a further complication for Cadiz, project opponent Sen. Dianne Feinstein (D-Calif.) has for years added a rider to the federal budget barring the BLM from spending money on anything related to the groundwater project. A spokesman for Feinstein said the provision "will be in there again." As long as the rider is in effect, the BLM won't have the funds to review a pipeline application.

"I remain concerned the Cadiz project could damage the Mojave Desert beyond repair and believe the BLM decision to deny the right-of-way is the right one," Feinstein said in a statement. "I'll continue to work through the Appropriations Committee to block any additional attempts to draw down this aquifer. We need to use water more responsibly, not less, and the Cadiz project is a bad idea."

In a response sent to the BLM director in Washington, Cadiz President Scott Slater on Monday argued that the agency was misinterpreting an Interior Department solicitor's opinion and should rescind the determination.

"We're disappointed the BLM decided to take a political path," Slater said in an interview. "They wholly ignore the solicitor's opinion."

The decision is technically an "administrative determination" that cannot be appealed. But Slater, a well-known water attorney, said the company would "consider all legal remedies," including a federal lawsuit. "We'll press on," he added.

Cadiz, founded by Keith Brackpool, wants to pump enough groundwater from beneath its land in the Mojave Desert to supply 100,000 homes a

> year and sell it to urban California at prices that could, over the project's 50-year-life, reap $1 billion to $2 billion in revenue.
>
> The project was approved by San Bernardino County and the company has so far prevailed in environmental lawsuits challenging the proposal under state law. But opponents are appealing those rulings. And desert advocates complain the project will profit by mining groundwater that flows from beneath adjacent public lands.
>
> "The company was trying to exploit what amounts to a loophole to avoid having to go through a more rigorous environmental review," said David Lamfrom, California desert program director for the National Parks Conservation Assn., one of a number of conservation groups fighting the project.
>
> The BLM decision was years in the making. It hinges on a 2011 opinion by the Interior Department solicitor that railroads cannot authorize activities in their federal right-of-ways "that bear no relationship to the construction or operation of a railroad."
>
> Cadiz argued that the water pipeline would further the purpose of the Arizona and California Railroad by providing water for fighting trestle fires and for a planned tourist steam train, as well as create additional access to the rail line.
>
> The BLM found otherwise. "Conveyance of water for public consumption is not a railroad purpose because the activity itself is not necessary for the construction or operation of a railroad, and the origin of the activity itself is a non-railroad purpose," the agency stated in a summary document.

103. On these news, shares of Cadiz fell $0.41 per share, over 8%, on unusually heavy volume, to close at $4.50 per share on October 6, 2015.

104. On October 7, 2015, a column was published in the *Los Angeles Times* entitled, "The Cadiz water scheme: How political juice kept a bad idea alive for years," which revealed that political influence was the driving force behind the

proposed Project and the required environmental review of the proposed Project may effectively end it. Therein, the article stated, in relevant part:

> It has never been a great idea to count Cadiz entirely out of the race to sell its costly water deal to the public, considering its long history of lining up powerful political friends. Yet it hasn't been a great idea to bet on the company either, since its stock, after spending a few quarters around the turn of the century in the $200+ stratosphere, more recently has been snuggled down in the single-digit cellar.
>
> But it now looks as though Cadiz has run out its string. The Dept. of the Interior may have put the final kibosh on the firm's always-questionable plan to pump groundwater out of the Mojave Desert and deliver it via a 35-mile pipeline to the Colorado Aqueduct, and thence to Southern California.
>
> Specifically, the agency last week nixed Cadiz's proposal to escape environmental review by running its desert pipeline over existing railroad rights-of-way. The agency's Bureau of Land Management said the project would still require environmental review, which may be tantamount to a death sentence.
>
> Cadiz's CEO, a water attorney named Scott Slater, vowed to "press on," but he'll be marching along a very long trail. Cadiz shares closed Wednesday at $4.01, down nearly 50% from Friday, before the BLM action was made public.
>
> The real question about Cadiz is how it has managed to carry on a losing fight for so long. The answer has much to do with political influence, so it's worth taking a look at this company's discreditable history, which we've been following for 13 years.
>
> Cadiz was the brainchild of an investment promoter named Keith Brackpool, who came to the U.S. after pleading guilty to criminal charges relating to securities trading in Britain. His idea was to store trillions of gallons of Colorado River water in the sands beneath a 27,000-acre tract Cadiz owned in the desert, while also extracting water from an aquifer underlying the property.

The $150-million project had limited appeal for the Metropolitan Water District, which serves most of Southern California and was to be Cadiz's putative partner (but which would have had to put up most of the money). It had no appeal for environmentalists, who pointed to studies showing that Cadiz was planning to extract more underground water than could be naturally replenished, and who were horrified at the ecological impact of a pipeline stretching miles across the desert.

What Cadiz had in abundance, however, was political juice. While he was pushing the deal at the MWD, Brackpool served as a contributor and fund-raiser for then-Gov. Gray Davis, a political adversary of the MWD who named his friend to two statewide water committees. "The thinking was: You make a deal with Keith Brackpool, and you're on the good side of Gray Davis," a former MWD board member told me in 2002.

Former Rep. Tony Coelho of California, an important Democratic Party fund-raiser, served on the Cadiz board. Ex-Interior Secretary Bruce Babbitt, a former Democratic governor of Arizona, joined its payroll to work on international water deals, none of which came off. In 2005, the company paid then-Public Utilities Commissioner Susan Kennedy, soon to become Gov. Arnold Schwarzenegger's chief of staff, a $120,000 consulting fee. In 2009, while she was working for Schwarzenegger, he endorsed the Cadiz scheme as "a path-breaking, new, sustainable groundwater conservation and storage project."

Brackpool hobnobbed with former Los Angeles Mayor Antonio Villaraigosa, contributing to his political campaigns, giving him a job between electoral posts and joining him on an East Asia trade junket. The one shadow over the political landscape was cast by Sen. Dianne Feinstein of California, an inveterate Cadiz opponent who for years has placed a rider in the federal budget barring the BLM from spending money on anything related to the groundwater project, including environmental review.

Still, the firm's other connections helped to keep the plan afloat even after it was rejected by the MWD in 2002, overcoming the implicit threat of retaliation by Davis. The scheme, as I wrote in 2009, had "a sort of shimmering authenticity, like a desert mirage." Brackpool and Cadiz promoted it as an answer to the state's long-term water shortage, perhaps hoping that no one would notice the inherent contradiction of spending

> money to store "surplus" water from the Colorado River when there isn't any surplus to store.
>
> For years Cadiz Inc. has struggled on, occasionally signing up credulous water districts as partners. But it has mostly been a stock-trading play, its shares rising and falling in a sawtooth pattern as the occasional news release about new supporters is balanced with the reality that the deal looks like an enormous long shot. Its lifeblood is debt, which had been passed around like a hot potato by investors betting on the come — figuring that sometime, somehow, lightning may strike and the Cadiz deal gets done.
>
> Brackpool remains chairman, collecting $275,000 in cash and stock grants last year. That's down from the more than $1 million he got in cash and stock grants in 1999, but it's not bad, especially since the company lost about $19 million last year on revenues of $336,000 from farming. In fact, financial disclosures don't show that Cadiz has ever had a profitable year, one reason that Metropolitan Water District officials didn't regard it as an especially alluring financial partner.
>
> Slater can still be heard on occasion pushing the idea that the California drought and water shortage is a great opportunity for investors in water companies like his. The truth is probably just the opposite: The realities of water in the West are what make schemes like the Cadiz project look good only to the unwary.

105. On this news, shares of Cadiz fell $0.49 per share, or nearly 11%, on unusually heavy volume, to close at $4.01 per share on October 7, 2015.

106. On October 8, 2015, GeoInvesting, LLC published a research report on *SeekingAlpha.com* entitled, "We Think Cadiz's Equity Is Worthless And Shareholders Will Drown Under Its 'Water Project'," which revealed that the proposed Project's failure would be imminentin light of BLM's determination that the proposed Project falls outside of AZRC ROW. Therein, the article stated, in relevant part:

**Summary**

- A letter on October 5th from the California State Office of the Bureau of Land Management continues to paint a bleak picture for CDZI's focus – its ongoing "water project".
- This reconciles with, and further validates, past critical articles suggesting that the project is doomed for eventual failure and, as such, the company may be as well.
- On top of its main business operation looking like an impossibility, CDZI faces a major liquidity crisis and has enormous debt coming due.
- As it stands, CDZI's balance sheet is insolvent and the company's equity is worth $0 on paper with seemingly no future road towards profitability or cash generation.
- Without steady profits, we value CDZI at what it's worth on paper and believe it's on its way to $0, be it from bankruptcy, eventual dilution or other means.

The short case on Cadiz Inc. (NASDAQ:CDZI) is centered on two damning points: the company's main business project (a water project focused on relocating water from an aquifer in the Mojave Desert) seems doomed for imminent failure and, in the meantime, CDZI has an insolvent balance sheet and has posted a loss for the last 42 quarters straight.

The fact is that the company is essentially a one-trick pony and has been working on the same "water project," as they call it, for years, with very little tangible progress being made on the necessary regulatory front, while enriching insiders and burning through millions of dollars. The project's recent resurgence, seemingly the only reason to potentially buy the stock, has been called, "the latest version of a proposal that's been floating around for more than 15 years."

Or, as the LA Times put it yesterday, "Cadiz was the brainchild of an investment promoter named Keith Brackpool, who came to the U.S. after

pleading guilty to criminal charges relating to securities trading in Britain."

This project was the one potential success story the company had and was dealt a massive blow just days ago that we think will be extremely detrimental to the company. Don't take our word for it - the company has even stated themselves, in their 10-Q, that their ability repay their debt and remain liquid depends on the success of this project.

While this has been ongoing, CDZI has been looting its balance sheet and losing money quarter after quarter, for years.

It has been argued exhaustively that CDZI's water project has been, and will continue to be, a complete failure. For those unfamiliar with CDZI, this project represents just about all of the future prospects that investors are seemingly betting on when they are buying CDZI stock. This detailed and lengthy take down of the company's water project, published in April 2015 by The Pump Stopper, is a must read as a pre-requisite for those reading this article and looking to familiarize themselves with the criticism surrounding CDZI.

Today, we take the next step in identifying what we believe to be an extremely promising short case against CDZI. Since the water project has been opined on at length, we're only going to look at recent developments from the California State Bureau of Land Management and how they seem to validate past reports. Finally, we're going to take a look at the company's alarming liquidity crunch, insolvent balance sheet and perpetual cash burn.

**Recent Regulatory Correspondence Confirms Short Thesis**

The latest, and arguably the most threatening roadblock the company has faced is in a letter they received from the US Department of the Interior in early October. The letter notifies the company that it would not be allowed to use a loophole that the company was seeking to use in order to move its water pipeline project forward ("cannot be authorized").

The letter cites not just one issue with the company's plan, but rather **numerous** issues that it takes exception with:

1. the water conveyance pipeline
2. the fire suppression system
3. an access road
4. power lines
5. the excursion train

The letter makes it abundantly clear that CDZI is not furthering a railroad purpose, mentioning those words specifically numerous times.

The request was seeking to package CDZI's water pipeline project in with late 1800's railroad regulations that allowed usage of public land relatively freely for those looking to further a "railroad purpose."

* * *

The company's plan was to tuck its pipeline into this exception, as this would be a way around Federal Review of the company's project, which we're guessing the company does not want to happen, as it has been called a death sentence for the project here ("already effectively failed Federal Review"), here ("may kill the project") and here again ("project failure and bankruptcy").

This is important because this exemption was seemingly the only back ended way that the company could conceive of getting approval for its project. It has widely been regarded that if the company needs to seek a federal review, the project might as well be considered dead.

As the KCET report puts it succinctly, again,

In essence, the seemingly minor "administrative determination" means the company will likely have to put its project through a full federal environmental review if it's going to proceed. And that means federal hydrologists will cast a critical eye on the company's claims, and that may kill the project.

This is the stage the company is at now. We think this project, and CDZI, are as dead as a doornail.

The [project] has a very slim "Hail Mary" chance of getting the BLM to overturn the appeal, as it says in the letter that it's not technically final -

> but we believe the issues that would have to be addressed in order to make such an appeal worthwhile are far beyond the realm of what is possible at this point in CDZI's lifecycle. In another "bullish scenario," the company may have to tack many additional years onto its timeline while somehow dodging bankruptcy. At the worst, the end appears to be very near. We believe the Board of Directors needs to look very carefully at the best options for CDZI and its creditors at this point.
>
> The company's method of disclosing this recent letter is also interesting. The company's disclosure methods surrounding this project had been in question for some time in prior critical articles. Adding to that contention, we would like to review the crux of the letter that the company saw and compare that with the headline that the company put out to investors.
>
> Based on all this information, BLM has reached an administrative determination that the Project as described cannot be authorized by ARZC because it is outside the scope of ARZC's
>
> [1] Solicitor for the Department of the Interior, Opinion M-37025 "Partial Withdrawal of M036964-*Proposed Installation of MCI Fiber Optic Communication Line Within Southern Pacific Transportation Co.'s Railroad Right-of-Way*" (Nov. 4, 2011) ("2011 M-Opinion").
> [2] The four railroad rights-of-way granted to the ARZC that are part of this proposal are serialized as follows:
> CALA 0 010895 (granted 4/3/1911)
> CALA 0 011098 (granted 11/8/1905)
> CALA 0 011099 (granted 4/3/1911)
> CALA 0 011100 (granted 4/3/1911)
>
> And here is what they handed investors:
>
> **Cadiz Inc. Announces Guidance from US Bureau of Land Management Regarding Cadiz Water Project's Proposed Use of a Railroad ROW**
>
> Guidance? Yes, they were "guided" that their project "could not be approved."

* * *

A Massive Liquidity Concern, Major Risk for Shareholders

CDZI has, on the other hand, done some things well over the last few years: issuing shares, for instance. Here's the company's ballooning share count, up more than 50% since 2006. We expect this trend to continue further as the debt laden company has narrowing choices aside from issuing equity if they want to keep "operations" going.




The company's cash flow tells the story of the coming dire need for cash. In the last 6 months, the company has burned $5.3 million in cash (silver lining: down from $6.5 million the year prior!). At this rate, the company is going to face some cash problems within a quarter or two and we expect further financing, should the Board allow this company to continue as is.

| ($ in thousands) | | For the Six Months Ended June 30, 2015 | 2014 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net loss | $ | (10,832) | (9,209) |
| Adjustments to reconcile net loss to net cash used for operating activities: | | | |
| Depreciation | | 126 | 127 |
| Amortization of debt discount and issuance costs | | 449 | 417 |
| Interest expense added to loan principal | | 3,982 | 3,689 |
| Compensation charge for stock and share option awards | | 510 | 61 |
| Changes in operating assets and liabilities: | | | |
| Decrease in accounts receivable | | 144 | 48 |
| Increase in prepaid expenses and other | | (379) | (258) |
| Increase in other assets | | (243) | (271) |
| Increase (decrease) in accounts payable | | 324 | (611) |
| Increase (decrease) in accrued liabilities | | 571 | (550) |
| Net cash used for operating activities | | (5,348) | (6,557) |

> The company generates minimal revenue, and has survived over the last 10 to 15 years by taking on lower and lower quality debt while plundering the balance sheet, resulting in negative equity for shareholders. All the while, insiders have been paid handsomely and the company continues to bet its future on a project that does not seem viable.
>
> Here is what the Board is allowing company executives to take home in the last three years, from the most recent proxy. The CEO has netted more than $800K in three years, the CFO has netted well over $1 million, and the Chairman has taken home over $1.5 million:

107. On this news, shares of Cadiz fell $0.42 per share, or nearly 10.5% on unusually heavy volume, to close at $3.59 per share on October 8, 2015.

108. On October 9, 2015, the Company issued a press release entitled, "Cadiz Inc. Issues Statement on Media Reports Following BLM Guidance," which revealed that the Company had confirmed BLM's determination that the proposed Project falls outside of AZRC ROW and unsuccessfully attempted to stem the decline in its stock price in light of the revelations concerning BLM's decision. Therein, the Company stated, in relevant part:

> Over the past week, various erroneous media and opinion pieces have been published about the Company and the status of the Cadiz Valley Water Conservation Recovery & Storage Project ("Project") following an announcement made related to the Project's proposed use of an 1875 Railway Right-of-Way ("ROW") for a water conveyance pipeline. On

Monday, October 5, 2015, the Company provided guidance to shareholders that we had learned through third parties that the U.S. Bureau of Land Management ("BLM") intended to find that the Project's proposed use of the ROW was outside the scope of the original grant. The Company has since confirmed the decision and has submitted a letter in response to the U.S. Director of the BLM. We believe the findings issued by the California State Director of the BLM, who retired the day the letter was sent, are contrary to federal law and policy and should be rescinded.

The portrait of Cadiz depicted in the press recently does not reflect the Company and its assets of today. The Company owns 45,000 acres of agricultural land and water rights and permits to capture and conserve 50,000 acre-feet of water per year under state law in full compliance with local groundwater ordinances. Since 2008, the Company has made management changes with the appointment of Scott Slater as CEO, invested in science, partnered with the best-in-class water agencies and public interest groups, pursued an environmentally sound Water Project and received approvals for such a project from those public agencies with jurisdiction over it. These approvals were upheld in Court and have been supported in appellate proceedings by 11 Amici. The Company has also invested in all of its diverse land assets and, last year, received permits for the largest land bank dedicated to the conservation of the desert tortoise in California history. The Company is proud of its safe and sustainable Water Project, which was approved under the most stringent environmental laws in the country, and we will continue to move ahead to deliver a reliable water supply to Southern California.

Scott Slater said, "We have an approved water conservation project to supply water for 400,000 people, a final environmental impact report and a groundwater management approval sustained by a California Superior Court Judge who dismissed all 6 cases brought against the Project and sustained every aspect of the government approvals.

"It wasn't politics or connections that established the quantities of groundwater in aquifers beneath the earth in the Fenner Valley. Science, not politics, measured the evaporation from dry lakes around the Project area and determined it balances with the precipitation that enters the

> aquifer. Methodical investigation, study and analysis, not the ballot box, concluded that impacts feared by some are scientifically impossible.
>
> "We will be persistent in our efforts to demonstrate to the BLM that the public interest and its own guidance documents require that it modify its baseless decision and if our requests are unsuccessful, we will seek a swift resolution in Federal Court. We are confident in our case and that our cause is just."

109. On this news, shares of Cadiz fell $0.58 per share, over 16% on unusually heavy volume, to close at $3.01 per share on October 9, 2015.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

110. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Cadiz common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

111. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cadiz securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cadiz or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

112. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

113. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

114. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Cadiz;

(c) whether the Individual Defendants caused Cadiz to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Cadiz securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and,

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

115. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

116. At all relevant times, the market for Cadiz common stock was an efficient market for the following reasons, among others:

(a) Cadiz stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) During the class period, on average, over three hundred thousand shares of Cadiz stock were traded on a weekly basis, demonstrating a very active and broad market for Cadiz stock and permitting a very strong presumption of an efficient market;

(c) As a regulated issuer Cadiz filed with the SEC periodic public reports and was eligible (and did file) S-3 registration statements with the SEC during the Class Period;

(d) Cadiz regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Cadiz was followed by a number of securities analysts who wrote reports and followed Cadiz during the Class Period; and

(f) Unexpected material news about Cadiz was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

117. As a result of the foregoing, the market for Cadiz's common stock promptly digested current information regarding Cadiz from all publicly available sources and reflected such information in Cadiz's stock price. Under these

circumstances, all purchasers of Cadiz's common stock during the Class Period suffered similar injury through their purchase of Cadiz's common stock at artificially inflated prices, and a presumption of reliance applies.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: AFFILIATED UTE**

118. Neither Plaintiffs nor the Class need prove reliance either individually or as a class because under the circumstances of this case, which involves a failure to disclose BLM's determination that the Project did not fall within the scope of the ARZC ROW and the failure to adequately disclose the material related party transactions described herein above, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

119. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

120. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Cadiz securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

121. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Cadiz common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

122. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Cadiz as specified herein.

123. Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cadiz's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Cadiz and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Cadiz common stock during the Class Period.

124. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior

officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business prospects and operations; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and business projects at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

125. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cadiz's future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business prospects and operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

126. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Cadiz common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Cadiz's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the

common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Cadiz common stock during the Class Period at artificially high prices and were or will be damaged thereby.

127. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Cadiz's Project, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased their Cadiz common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

128. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

129. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

130. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

131. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132. The Individual Defendants acted as controlling persons of Cadiz within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their

high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

133. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

134. As set forth above, Cadiz and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

135. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

136. This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of common stock giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: October 21, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: *<u>/s/ Laurence M. Rosen</u>*
Laurence M. Rosen, Esq.
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Kara M. Wolke
Elaine Chang
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On October 21, 2015, I electronically filed the foregoing SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on October 21, 2015

/s/ Laurence Rosen
Laurence Rosen